IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

TAMMI J. LOVE                                                                    PETITIONER
ADC #707670

V.                                    NO. 5:04CV00122 WRW/JWC

LARRY NORRIS, Director,                                          RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District

Court Judge William R. Wilson, Jr.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or legal

basis for the objection.  If the objection is to a factual finding, specifically identify that

finding and the evidence that supports your objection.  An original and two copies of your

objections must be received in the office of the United States District Court Clerk no later

than eleven (11) days from the date of the findings and recommendations.  The copy will

be furnished to the opposing party.   Failure to file timely objections may result in waiver

of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different,

or additional evidence, and to have a hearing for this purpose before the District Judge,

you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge  (if such
        a  hearing is granted)  was not  offered at  the hearing before the Magistrate
        Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite 402
> Little Rock, AR 72201-3325

## RECOMMENDED DISPOSITION

Tammi J. Love, an Arkansas Department of Correction inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus, as amended (docket entries #2, #17). Respondent concedes that Petitioner is in his custody and has exhausted all nonfutile state remedies, see 28 U.S.C. § 2254(a) & (b), but contends that the petition should be dismissed for other reasons (docket entries #10, #20).  Because Petitioner's claims cannot entitle her to relief, the petition should be DISMISSED.

I.

Following a jury trial in October 2002 in the Circuit Court of Logan County, Arkansas, Petitioner was convicted of manufacturing a controlled substance, possessing drug paraphernalia, and terroristic threatening.   She was sentenced to twenty years of imprisonment.  In a direct appeal to the Arkansas Supreme Court, Petitioner raised one claim: that the trial court erred in denying her motion to suppress evidence obtained when

2

law enforcement officers received consent from her co-tenant to enter their residence and then searched Petitioner's bedroom, without her consent. (Resp't Ex. B.)[1] Her convictions were affirmed.  Love v. State, 138 S.W.3d 676 (Ark. 2003) (Resp't Ex. A).  There is no evidence or allegation that Petitioner sought any further relief in state court.

Petitioner's initial § 2254 habeas petition (docket entry #2), supported by a brief and appendix (docket entries #3, #5), advanced four claims for relief, along with sub-claims. In reply to Respondent's contention that several of the claims were procedurally defaulted due to Petitioner's failure to properly present them to the state courts, Petitioner dismissed the defaulted claims (docket entries #10, #12, #14).  Following the United States Supreme Court's decision in Georgia v. Randolph, 126 S. Ct. 1515 (2006), Petitioner amended her petition to present further supporting legal arguments; Respondent responded; and Petitioner replied (docket entries #17, #18, #20, #21).  The claims currently before the Court are as follows:[2]

1. Petitioner's conviction was secured through evidence obtained in an illegal search and seizure because evidence was obtained from a warrantless search of her private bedroom, violating her rights under the Fourth Amendment to the United States Constitution and the Arkansas Constitution;

2. Her right to due process, guaranteed by the Fourteenth Amendment to the United States Constitution and by the Arkansas Constitution, was violated when the Arkansas Supreme Court upheld the trial court's denial of her motion to suppress on a different basis than that espoused by the trial court; and

3. A constitutional violation has resulted in the conviction of one who is actually innocent, because the state failed to disclose exculpatory evidence (the absence of any needles or other contraband in plain view), in violation of Brady v. Maryland, 373 U.S. 83 (1963), and her right to due process.

---

[1]Resp't Ex. A and B are attached to docket entry #10.

[2]These were designated as Grounds 1, 2 and 3.3 in the initial petition.

Her amended petition relies upon <u>Randolph</u>, in which the Supreme Court held that a warrantless search of shared premises violates the Fourth Amendment when police obtain the consent of one occupant but another occupant is physically present and expressly refuses to consent.  <u>Randolph</u>, 126 S. Ct. at 1518-19, 1528.  In so holding, the Supreme Court rejected what had been the majority rule allowing one co-occupant's consent to override the other's express objection, citing cases from various jurisdictions. <u>Id.</u> at 1520 n.1.  Among them was the Arkansas Supreme Court's decision in Petitioner's direct appeal, <u>Love v. State</u>, <u>supra</u>.

Respondent asserts, first, that this Court is bound by the Arkansas Supreme Court's rejection of her claims under 28 U.S.C. § 2254(d), and second, that review of Petitioner's claims is barred under <u>Stone v. Powell</u>, 428 U.S. 465 (1976).

II.

For the most part, the following facts are taken from the Arkansas Supreme Court's opinion affirming Petitioner's conviction, based on the testimony at a pretrial hearing on her motion to suppress.  Petitioner has not rebutted any part of the factual summary by clear and convincing evidence; therefore, it is presumed correct.  <u>See</u> 28 U.S.C. § 2254(e)(1). Additionally, this Court has reviewed the suppression hearing transcript, (Resp't Ex. C),[3] and has determined that the factual summary is reasonable in light of the evidence presented at the hearing.  <u>See</u> 28 U.S.C. § 2254(d)(2); <u>Whitehead v. Dormire</u>, 340 F.3d 532, 537 (8th Cir. 2003).

---

[3] Resp't Ex. C, attached to docket entry #16, was submitted at the direction of the Court (docket entry #14).  All transcript references are to this exhibit.

4

At the suppression hearing in April 2002, Petitioner, represented by counsel, appeared and called two witnesses (herself and her co-defendant, Jamie Emberson). The state called six witnesses, including Petitioner's roommate and co-tenant (Curtis Timmons) and law enforcement officers who arrested Petitioner and searched her residence.

On December 2, 2001, Petitioner's roommate, Timmons, told the Booneville Police Department that Petitioner and a friend had been processing methamphetamine at their (Timmons and Petitioner's) residence. Although Timmons and Petitioner shared the home, they had separate bedrooms. Following Timmons's statement to the police, Booneville Police Department officers and Logan County Sheriff's Department deputies went to the residence to arrest Petitioner pursuant to an outstanding arrest warrant. Officer Dudley Crossland testified that upon arriving at the residence, he and Deputy Russell Stilwell informed Petitioner, who answered the door, that they had a warrant for her arrest. Officer Crossland testified that she told him she had something on the stove, at which time he followed her from the doorway to the kitchen of the residence, where she turned off the stove. Officer Crossland and Petitioner returned to the front porch where she was arrested. Following the arrest after returning outside, Officer Crossland asked if anyone else was in the home. Petitioner advised that Emberson (Petitioner's co-defendant) was there, and he came out of the southwest bedroom, which was Petitioner's bedroom. Emberson sat on the front porch but was not arrested at that time.

Following Petitioner's arrest on the front porch, Officer Crossland asked her permission to search the home. Petitioner refused. He then asked Timmons for permission to search the home. Timmons had returned to the house for that purpose, and he gave his consent. Deputy Stilwell stayed outside with Petitioner and Emberson. After

Timmons gave consent, Officer Crossland, Detective Steve Reid, then-Deputy Albert Brown and Deputy Tom Delay entered the house.  Detective Reid testified that he was directed by Officer Crossland to go to the bedroom off the living room.  In that room, he testified that they found "different chemicals such as Heet, ... peroxide, hoses, filters, [and] some unknown liquid substances also."  (Tr. 100.)  Deputy Delay testified that upon being notified by another police officer that he had "found something," he "looked in at the bed." (Tr. 105.)  He saw what appeared to be drug paraphernalia and items used for the production of drugs laid out on the foot of the bed.

On recall, Officer Crossland testified that after searching the kitchen and dining area of the residence, he found a can of lighter fluid and lye.  He stated that either Deputy Delay or Deputy Brown indicated that they had found some things in the southwest bedroom. Upon entering the bedroom, Officer Crossland saw "tubing, duct tape, ... a big bowl of still unknown liquid, ... handmade filters, all kinds of jars, ... some diaper bags or bags ... [which] contained a plastic bag containing a white powdery substance ... a brown liquid substance ...,  ... paper filters, rubbing alcohol[,] ... [and] homemade funnels."  (Tr. 108.) Officer Crossland testified that it was possible to see some of the items on the bed and on an end table from outside the bedroom.

Deputy Brown testified that when "somebody hollered," he went to the southwest bedroom.  He stated that he could see through the doorway to the room that there were needles and "some different stuff" laying on the bed, as well as a duffel bag full of various items at the foot of the bed.  Through the doorway, Deputy Brown testified that he could see a "big glass jar with a clear liquid substance" on the dresser, which was in plain view.

(Tr. 112.)  He further testified that the door to the southwest bedroom was open when he walked into the house with Officer Crossland and Deputy Delay.

Petitioner also testified at the suppression hearing.  She stated that on that day, she got out of bed, got dressed, and closed the door of her bedroom before answering the front door.  She said she closed the door of the bedroom because she had children and had things in the bedroom which she did not want them to touch.  She stated that Emberson was already up and in the kitchen cooking.  She accused Officer Crossland of lying when he said that he followed her into the kitchen to turn off the stove.  She said that when the police arrived, she was in bed, and Emberson was in the kitchen cooking.  She also stated that she told the police officers that her three children were not there.

Emberson testified that after getting out of bed, he went into the kitchen to cook macaroni.  He said that Petitioner answered the door when the police officers came, and that she stepped back into the house to tell him that she was going to jail.  He also testified that Petitioner shut the door to the bedroom when she went to answer the front door and that nothing was on the bed when he left the bedroom.  He stated that while Petitioner had multiple jars in the bedroom, he had not seen a bag of white powder or a milk jug containing a brown substance in the room.  Additionally, he said that Petitioner would have tubing, because her children were on a breathing machine.

After the hearing, the trial court denied the motion to suppress:

··· I'm going to deny the motion to suppress and I'm going to do it on this basis.

Number one, I think law enforcement acted reasonable under the circumstances.  I don't even know that they needed to get the consent to search.  I think when they placed her under arrest they had a right to secure the premises.  They had a right to go into the home and specifically go into

her home.  They had a right and I would say they had a duty to go into that home and make sure there were no young people in that home that were in danger.  And I guarantee you that if something bad had happened and there were children in that home and they'd gotten injured they would of heard about it later.  They had a duty to go in and make sure that home was secure and that is reasonable conduct.

Now they had a - arguably had a right to do it based on the arrest warrant, but that's not the basis by which they were operating.  But they went ahead and went a further step and obtained the consent to search from the co-tenant and for that reason I find the conduct was reasonable and the motion to suppress would be denied.

(Tr. 144-45.)

In her direct appeal, Petitioner argued that the evidence seized from her bedroom should have been suppressed as the result of an illegal search because her roommate could only consent to a search of common areas and his own private area.  The Arkansas Supreme Court rejected this as follows:

This court recently set forth our standard of review for a denial of a motion to suppress evidence obtained by a warrantless search:

Our standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge.  State v. Osborn, 566 S.W.2d 139 ([Ark.] 1978).  In Osborn, we stated:

[W]e have given considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts. [Harris v. State, 425 S.W.2d 293 (Ark. 1968).]  We must defer to the superior position of the trial judge to pass upon the credibility of witnesses.  Whitmore v. State, 565 S.W.2d [133] ([Ark.] 1978).  Osborn, supra.

Davis v. State, 94 S.W.3d 892, 894-95 ([Ark.] 2003).

We have said that a warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment.  See Latta v. State, 88 S.W.3d 833 ([Ark.] 2002); Welsh v. Wisconsin, 466 U.S. 740 (1984).  That presumption may be overcome, however, if the police officer

8

obtained consent to conduct a warrantless search.  See Stone v. State, 74 S.W.3d 591 ([Ark.] 2002).  See also Ark. R .Crim. P. 11.1 (2003) ("An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure.").  Consent to search the premises can only be given by a person who, by ownership or otherwise, is apparently entitled to give or withhold consent.  See Ark. R. Crim. P. 11.2(c) (2003).  Any search based on consent cannot exceed, in duration or scope, the limits of the consent given.  See Ark. R. Crim. P. 11.3 (2003).

The determination of third-party consent, like other factual determinations relating to searches and seizures, must be judged against an objective standard.  See Hillard v. State, 900 S.W.2d 167 ([Ark.] 1995).  Simply stated, that standard is: would the facts available to the police officer at the moment warrant a man of reasonable caution to believe that the consenting party had authority over the premises?  See id.  This court has recognized that a warrantless search can be valid where voluntary consent has been given by a third party with sufficient control or authority over the premises.  See Spears v. State, 605 S.W.2d 9 ([Ark.] 1980).  Whether consent by that party is valid under the Fourth Amendment standards rests upon mutual use of the property by persons generally having joint access or control for most purposes.  See Grant v. State, 589 S.W.2d 11 ([Ark.] 1979).  The pertinent question is whether the one giving consent possesses common authority or other sufficient relationship to the premises.  See id.

In United States v. Matlock, 415 U.S. 164 (1974), the United States Supreme Court commented:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room), but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 172.

In the instant case, there is no question but that Timmons, as co-tenant, had the authority to consent to the search of common areas such as the living room.  And it was from the living room that Deputy Brown saw the open bedroom door and that he, Deputy Delay, and Officer Crossland later saw into Love's bedroom through the open door and observed numerous items related to the manufacture of methamphetamine.  Thus, these items seized were in the plain view of the officers.  When police officers are legitimately at a location and acting without a search warrant, they may seize an object in plain view if they have probable cause to believe that the object is either evidence of a crime, fruit of a crime, or an instrumentality of a crime.  See Fultz v. State, 972 S.W.2d 222 ([Ark.] 1998).

Despite the dissent's contention to the contrary, two officers provided testimony to support a finding that some of the items seized were in plain view from outside the bedroom prior to the officers' search of the bedroom:

> The Court:  Let me ask, could you see these items from outside the bedroom or did you actually have to go into the bedroom to see them or could you see them from outside the bedroom?
>
> Officer Crossland:  You could see some of the items on the bed. Some of them were sitting on like a end table.  But to see all of them you would have to go into the bedroom, yes.
>
> The Court:  But you could see some without?
>
> Officer Crossland:  Yes.
> ....
>
> Prosecutor:  And what did you-first of all, could you see whatever you found in the bedroom through the door?
> Deputy Brown:  Yes.
> Prosecutor:  And what was it that you saw?
> Deputy Brown:  There was some needles and some different stuff laying on top of the bed and just at the foot of the bed there was a duffel bag full of various items.  I'm not sure exactly what.  And on the – there was a dresser that had a big glass jar with a clear liquid substance inside of it that you could see from the doorway.
> Prosecutor:  This was all out in plain view?
> Deputy Brown:  Yes.

Because the officers were able to see drug-related items in plain view from the bedroom doorway prior to even entering the room, there was probable cause to seize those items.  See e.g., Fultz v. State, supra.

We hold that the search was a valid one and that the drug paraphernalia was properly seized and that Love's motion to suppress was properly denied by the circuit court.  See Wright v. State, 593 N.E.2d 1192 (Ind. 1992) (holding that where police officers obtained appellant's roommate's consent to search, following appellant's arrest, and observed, from the hallway, a knife and sheath on appellant's dresser, there was no error in the admission of the evidence at trial, as the circuit court correctly concluded that the roommate's consent permitted the officers to lawfully search the common areas of the residence from which they could see the items in plain view).

Our affirmance is for a different reason than the reasons espoused by the circuit court.  Nevertheless, this court has made it abundantly clear that we can affirm a decision by the trial court, albeit for a different reason.  See e.g., McCoy v. State, 69 S.W.3d 430 ([Ark.] 2002).  There is also the point that Love testified that she shut her bedroom door while Deputy Brown testified that it was open when he walked into the house with Officer Crossland, Detective Reid, and Deputy Delay.  Matters of credibility, of course, are for the circuit court, see Davis v. State, supra, but the court did not expressly decide that issue.   In examining the totality of the circumstances, we give weight to Deputy Brown's testimony that the door was open, thereby enabling the police officers to look through the bedroom doorway and see at least some of the drug items, in plain view.

There is the suggestion, although it is not clear from the abstract or record, that Detective Reid or some other police officer may have entered the bedroom prior to the approach by Deputies Brown and Delay and Officer Crossland to the doorway, where they could see the drug-related items in plain view.  It is incumbent upon a defendant/appellant to develop such issues at the suppression hearing.  This was not done, based on the record before us, and we will not speculate on matters not fully developed.  See, e.g., Raymond v. State, 118 S.W.3d 567 ([Ark.] 2003).  We note, however, that the dissent has clearly speculated on this point and done so in favor of Love, without citation to authority for doing so.

In sum, we affirm the circuit court on the basis that police officers were able to view the drug-related items which were in plain view from the bedroom doorway and testified to that effect.  See Wright v. State, supra.

Love, 138 S.W.3d at 679-82 (parallel citations omitted).

III.

In <u>Stone v. Powell</u>, the United States Supreme Court held that, where a state prisoner has been afforded "an opportunity for full and fair litigation of a Fourth Amendment claim, [he] may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Stone</u>, 428 U.S. at 494.  An opportunity is "full and fair," thus barring federal habeas review, unless (a) the state has provided no procedure for raising Fourth Amendment claims, or (b) the defendant was foreclosed from using the state procedure because of an "unconscionable breakdown" in the system.  <u>Willett v. Lockhart</u>, 37 F.3d 1265, 1273 (8th Cir. 1994).

A federal habeas court is not required to conduct an evidentiary hearing on a Fourth Amendment claim or to review the state court records to determine if the state's factual findings are fairly supported by the record.  <u>Id.</u> at 1270-71.  The habeas court is not required to consider whether full and fair litigation of the claims in fact occurred but only whether the state provided an opportunity for such litigation.  <u>Id.</u> at 1270.  The <u>Stone</u> bar applies even where the state court has erred in deciding the legal merits of a Fourth Amendment claim.  <u>Id.</u> at 1268; <u>see</u> <u>Sweet v. Delo</u>, 125 F.3d 1144, 1149 (8th Cir. 1997).

In this case, there is no question that Arkansas has an established procedure for raising Fourth Amendment claims in the state courts, which Petitioner utilized. Represented by counsel, she raised her Fourth Amendment claims in the trial court through a pretrial motion to suppress.  <u>See</u> Ark. R. Crim. P. 16.2.  An evidentiary hearing was held, and Petitioner was allowed to present witnesses, cross-examine the state's witnesses, and make her arguments.  She received a ruling on the merits of her Fourth

Amendment claims, which she then appealed with the assistance of counsel.   The Arkansas Supreme Court reviewed and decided the merits of her claims.

Petitioner argues that she did not receive a full and fair opportunity to litigate her claims in the state courts because the Arkansas Supreme Court upheld the trial court's denial of her suppression motion on a different basis than that espoused by the trial court. She says her appellate brief was based on the trial court's ruling and that it was impossible to defend her case on appeal when the Arkansas Supreme Court found a new way to justify the lower court's ruling without permitting her an opportunity for rebriefing or oral argument.   She says this was equivalent to holding a second suppression hearing in her absence.

In Willett, 37 F.3d at 1272 n.4, the Eighth Circuit noted, "[w]ithout expressing either approval or disapproval," the case of Riley v. Gray, 674 F.2d 522 (6th Cir. 1982).   In Riley, the Sixth Circuit found that there had been a breakdown in the state's procedural mechanism where the petitioner's standing to raise a Fourth Amendment claim had not been an issue in the trial court, the standing issue had not been briefed and argued on direct appeal through no fault of the petitioner, and the state appellate court found that the petitioner lacked standing without remanding to the trial court to give him an opportunity to argue the issue.   The Sixth Circuit thus declined to apply the Stone bar to preclude review of the merits of the petitioner's Fourth Amendment claim.   Id. at 526-27.

Riley is distinguishable because, in the lower court, the petitioner reasonably relied upon a United States Supreme Court case which did not require him to establish his standing to challenge the search.   In light of intervening court decisions, the state appellate court did not apply the "automatic standing" rule and dismissed the case for lack of

13

standing.  This created an "unanticipated and unforeseeable application of a procedural rule which prevent[ed] state court consideration of the merits of the claim."  Id. at 527.

That is not the situation here.  Unlike Riley, there were no relevant intervening court decisions.  Also, in Riley, the state appellate court's dismissal on the procedural basis of standing *prevented* consideration of the merits of the petitioner's Fourth Amendment claim. Here, in contrast, the record shows that Petitioner was never prevented from arguing any aspect of her Fourth Amendment claims in the state court, nor were the state courts prevented from addressing the merits of those claims.  See Weber v. Murphy, 15 F.3d 691, 695-96 (7th Cir. 1994) (petitioner not denied opportunity to fully and fairly litigate his Fourth Amendment claim where state supreme court's decision was based on grounds not briefed or orally argued).

At the suppression hearing, the prosecutor argued that the warrantless search was justified due to the co-tenant's consent and because the items were in plain view through the open door to Petitioner's bedroom.  (Tr. 128-29.)  In response, Petitioner challenged the validity of the co-tenant's consent as to her private bedroom, argued that the conflicting consents should have put the officers on notice that a warrant was needed, and argued that the officers' testimony regarding the open door and who entered the room first was not credible.  (Tr. 129-32.)  The trial court then initiated discussion and arguments on whether the search was justified as incident to Petitioner's arrest or due to the possible presence of children.  (Tr. 132-44.)  In its ruling, the trial court gave two justifications for finding the search valid.  First, the court held that, when officers placed Petitioner under arrest, they had the right to secure the premises, justifying entry without a warrant.  Secondly, the court

stated that the officers "went a further step and obtained the consent to search from the co-tenant and for that reason I find the conduct was reasonable." (Tr. 144-45.)

In her appellate brief, Petitioner's stated argument was that the trial court erred "by denying a motion to suppress evidence when law enforcement received consent to enter a home from a tenant and searched the bedroom of the other tenant who did not give consent to enter the home." (Resp't Ex. B, at 25.) The brief, however, discussed whether the warrantless search could be justified on several different bases: (1) whether the consent given by Petitioner's roommate authorized a search of Petitioner's private bedroom over her objection, and whether the roommate had apparent authority to consent to a search of the whole house, (id. at 26-29, 32); (2) whether the search was valid as incident to Petitioner's arrest, including **whether, assuming the officers were justified in searching the living room, any evidence was in plain view through her open bedroom door**, (id. at 29-30, 32); and (3) whether the possibility of children being present constituted an emergency situation, (id. at 30-32).

The basis for the Arkansas Supreme Court's decision was that Petitioner's roommate "had the authority to consent to the search of common areas such as the living room ... [a]nd it was from the living room that Deputy Brown saw the open bedroom door and that he [and other officers] later saw into [Petitioner's] bedroom through the open door and observed numerous items related to the manufacture of methamphetamine." The court went on to find that, because the officers were legitimately in the living room pursuant to the co-tenant's consent, they had authority to seize the objects in plain view in Petitioner's bedroom. Love, 138 S.W.3d at 680-81.

It is true that the neither of the trial court's stated alternative justifications for finding the search valid (search incident to arrest, or consent by co-tenant) was the precise basis upon which the Arkansas Supreme Court ultimately found the search to be valid (consent by co-tenant as to common areas, then plain view for Petitioner's bedroom).  However, Petitioner's brief broadly discussed reasons why the search did not fit into any of the various exceptions to the Fourth Amendment warrant requirement, thereby accurately anticipating and discussing to some degree both the consent and plain view issues.  All of the issues were closely related and factually intertwined.  Furthermore, if Petitioner believed she had been denied the opportunity to fully develop any issue, she could have filed a petition for rehearing pursuant to Ark. Sup. Ct. R. 2-3, petitioned for a  writ of certiorari to the United States Supreme Court, or sought post-conviction relief in the state courts.  See Willett, 37 F.3d at 1272 n.5 (the "opportunity for full and fair litigation" through the state courts includes the right to petition the United States Supreme Court for certiorari after a decision by the state supreme court).  Petitioner did not take advantage of any of these further remedies.

Petitioner also argues that the suppression hearing was "merely a farce" because none of the testifying officers stated who first discovered the alleged contraband in her bedroom.  She says they all testified that they came to her bedroom only after being alerted by someone else.  She says it is not known whether the first officer who saw the alleged contraband was legally in an area where he could have made that discovery, which is required for the plain view doctrine to excuse the warrant requirement.  However, Petitioner was not prevented from arguing this perceived factual deficiency to the state

courts – and she did, repeatedly pointing it out at the suppression hearing, (Tr. 129, 130, 131, 143), and in her appellate brief, (Resp't Ex. B, at 29-30, 32).

Finally, Petitioner contends that the United States Supreme Court ruling in <u>Randolph</u> "effectively overruled" <u>Stone</u> and that she should not be denied application of its holding simply because, due to her limited knowledge, she chose to pursue her Fourth Amendment claim through a federal habeas petition, rather than through a petition for writ of certiorari. <u>Randolph</u> involved a defendant whose appeal of the denial of his suppression motion was successful in the state courts, leading the state to file a petition for writ of certiorari with the United States Supreme Court.   This was a continuation of direct review proceedings from state court which, as stated earlier, include the right to seek certiorari from the United States Supreme Court.   The federal habeas remedy, on the other hand, affords collateral review after a state conviction has become final through the direct-review process.   <u>See</u> <u>Beard v. Banks</u>, 124 S. Ct. 2504, 2510 (2004) (a state court conviction is "final" when the availability of direct appeal to the state courts is exhausted and the time for filing a petition for a writ of certiorari to the United States Supreme Court has elapsed or a timely filed petition has been denied).   It is a much narrower form of federal review, as evidenced by the well-established <u>Stone</u> doctrine.

Although Petitioner did not have the benefit of the <u>Randolph</u> decision at the time of her state court proceedings, this did not render them less than "full and fair" for purposes of the <u>Stone</u> bar.   In her state court proceedings, Petitioner made the same type of argument on the consent issue that was ultimately successful in the <u>Randolph</u> proceedings.   Moreover, she had the opportunity, just as the parties did in the <u>Randolph</u> case, to place this issue before the United States Supreme Court by filing a petition for writ

17

of certiorari following the Arkansas Supreme Court's decision in her direct appeal.  The fact that the Arkansas state courts ruled against her and that she pursued it no further does not mean that she was deprived of the opportunity for full and fair litigation of her Fourth Amendment claim.

It is clear that Arkansas has a system available for raising Fourth Amendment claims, and this record demonstrates that Petitioner was not foreclosed from presenting her claims due to any unconscionable breakdown in the system.  It is not this Court's function to determine if full and fair litigation actually occurred, but whether Petitioner was provided an opportunity for such litigation.  Here, she had an adequate opportunity, through counsel, to present all relevant arguments at her suppression hearing, on appeal or thereafter.  Right or wrong, the state court decisions cannot be reviewed here, nor can this Court reexamine the credibility of the witnesses who testified.

Accordingly, Stone bars this Court from reviewing Petitioner's Fourth Amendment claims. See Palmer v. Clarke, 408 F.3d 423, 437 (8th Cir.), cert. denied, 126 S. Ct. 755 (2005); Sweet, 125 F.3d at 1149; Poole v. Wood, 45 F.3d 246, 249 (8th Cir.1995); Willett, 37 F.3d at 1273; Cortis v. Kenney, 995 F.2d 838, 841 (8th Cir. 1993); Ferguson v. Jones, 905 F.2d 211, 213 (8th Cir. 1990).


IV.

Respondent's alternative basis for dismissal also precludes relief.  As stated, Petitioner raised her Fourth Amendment claims in the state courts, where they were denied on the merits.

A.      § 2254(d) Standard.

In the interests of finality and federalism, a federal habeas court is constrained by statute "to exercise only a 'limited and deferential review of underlying state court decisions.'" Sera v. Norris, 400 F.3d 538, 542 (8th Cir.), cert. denied, 126 S. Ct. 283 (2005).  Thus, where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief for the same claim in only three limited situations: where the state court adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); **or** (2) "involved an unreasonable application" of clearly established federal law, id.; **or** (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

A state court decision is "contrary to" federal law under § 2254(d)(1) if it applies a rule that contradicts the controlling Supreme Court authority or if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a Supreme Court case, but nonetheless reaches a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court's decision involves an "unreasonable application" of federal law under § 2254(d)(1) if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The habeas court must "ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.

19

Finally, a state court decision involves "an unreasonable determination of the facts" under § 2254(d)(2) "only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not enjoy support in the record." Sera, 400 F.3d at 543 (quoting 28 U.S.C. § 2254(e)(1)).

B.    Consent by Co-Tenant.

The first aspect of the Arkansas Supreme Court's decision is that the police could lawfully search the common areas of the home shared by Petitioner and her roommate due to her roommate's consent, even though Petitioner objected to the search.  Although the United States Supreme Court held in Randolph (in 2006) that this is no longer a valid basis for justifying a warrantless search, this was not the governing federal law at the time of the state supreme court's decision three years earlier (in 2003).

For the purposes of § 2254(d)(1), "clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions *as of the time of the relevant state-court decision*.' ... We look for 'the'governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*.'" Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams, 529 U.S. at 412 and Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003)) (emphasis added).

At the time the Arkansas Supreme Court ruled, no United States Supreme Court decision had held that a co-occupant's consent could not override a physically present, objecting co-occupant.  The most analogous United States Supreme Court decision was

20

United States v. Matlock, 415 U.S. 164 (1974), cited and relied upon by the state court,[4]
in which the Supreme Court held that consent by a co-occupant is sufficient to permit a
warrantless search, in the other's absence, providing the consenting party has authority
over the property.  Randolph expressly distinguished Matlock, drawing what the Supreme
Court admitted was a "fine line," to wit, "if a potential defendant with self-interest in
objecting *is in fact at the door and objects*, the co-tenant's permission does not suffice for
a reasonable search, whereas the potential objector, nearby but not invited to take part in
the threshold colloquy, loses out."  Randolph, 126 S. Ct. at 1527 (emphasis added).[5]

In deciding Randolph, the Supreme Court acknowledged that it was rejecting the
majority rule – reached by four Courts of Appeals and most state courts – that a co-
tenant's consent remained effective even in the face of an express objection.  Id. at 1520
n.1.  It was not objectively unreasonable for the Arkansas Supreme Court to apply the
same interpretation of Matlock as these other courts.  Therefore, it cannot be said that, in
ruling against Petitioner on the consent issue, the state supreme court applied a rule
"contrary to" any current, materially distinguishable Supreme Court case, or that it
"unreasonably applied" the governing Supreme Court law to the facts of this case.  See
Mitchell v. Esparza, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court
for simply holding a view different from its own, when the precedent from this Court is, at
best, ambiguous."); Swartz v. Burger, 412 F.3d 1008, 1011 (8th Cir. 2005) (reasonable
application may be demonstrated where several federal appellate decisions are consistent

---

[4] The state court also cited several state cases that relied on Matlock.  Love, 138 S.W.3d at 680.

[5] The Supreme Court thus left intact the holding in Matlock that a co-tenant's consent was valid as to
a defendant who was in a nearby squad car, and the similar holding in Illinois v. Rodriquez, 497 U.S. 177
(1990), where the defendant was asleep elsewhere in the apartment.  Randolph, 126 S. Ct. at 1527.

with the state decision); <u>Williams v. Bowersox</u>, 340 F.3d 667, 671 (8th Cir. 2003) (diversity of factually similar lower court decisions applying the applicable federal precedents suggests that state court did not unreasonably apply Supreme Court law).

      C.    <u>Plain View</u>.

The second aspect of the Arkansas Supreme Court's decision is that, once the officers were lawfully in the shared living room pursuant to the co-tenant's consent, the seizure of items from Petitioner's bedroom was justified under the plain view exception to the warrant requirement.

The Arkansas Supreme Court stated the governing law as follows: "When police officers are legitimately at a location and acting without a search warrant, they may seize an object in plain view if they have probable cause to believe that the object is either evidence of a crime, fruit of a crime, or an instrumentality of a crime." <u>Love</u>, 138 S.W.3d at 681.  The state case cited in support, <u>Fultz</u>, <u>supra</u>, in turn cites the governing United States Supreme Court precedents of <u>Horton v. California</u>, 496 U.S. 128 (1990); <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971); and <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987).  The state court concluded: "Because the officers were able to see drug-related items in plain view from the bedroom doorway prior to even entering the room, there was probable cause to seize those items." <u>Love</u>, 138 S.W.3d at 681.

Petitioner does not contend that the law stated and applied was inaccurate; rather, she contends that the evidence at the suppression hearing was inadequate to support the state courts' findings that any contraband was immediately apparent from outside Petitioner's bedroom.  She says the officers' testimony as to what they saw through her open bedroom door was misleading and useless because they also testified that they

approached the room only after being alerted by another, never-identified officer that a discovery had been made in that room.  She says that no officer ever admitted to being the first one in her bedroom and making the initial discovery.  She says this is "suspicious" and raises serious questions about the testifying officers' credibility.  She also says that she shut the bedroom door when she left it, and that no recognizable contraband was in plain view from the doorway.  She relies upon the dissent in her direct appeal, in which one justice thought the evidence was insufficient to show that any contraband was in plain view.  See Love, 138 S.W.3d at 682-83 (Hannah, J., dissenting).

As stated earlier, in evaluating a state-court decision, the Court must presume that the state court's factual findings are correct unless Petitioner rebuts them by clear and convincing evidence and the record contains no support for them.  This presumption of correctness applies to factual determinations of both trial and appellate courts.  Perry v. Kemna, 356 F.3d 880, 883 (8th Cir.), cert. denied, 125 S. Ct. 657 (2004).  Moreover, federal habeas review "gives federal courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434 (1983); see Perry, 356 F.3d at 883-85 (deferring to credibility determinations by state trial and appellate courts); Riggins v. Norris, 238 F.3d 954, 955 (8th Cir. 2001) (state court was entitled to disbelieve defendant's self-serving testimony); Loeblein v. Dormire, 229 F.3d 724, 726 (8th Cir. 2000) ("[T]he trier of fact is entitled to make the ultimate decision of whether testimony is to be believed.").

First, the Arkansas Supreme Court gave weight to Deputy Brown's testimony that Petitioner's bedroom door was open when he approached it, over the testimony of Petitioner and her co-defendant that she shut the door upon leaving the bedroom.  Love,

23

138 S.W.3d at 681-82.  This credibility finding is supported by the hearing transcript, (Tr. 113), and will not be disturbed.

Second, as pointed out by the Arkansas Supreme Court and again borne out by the suppression hearing transcript, the officers provided testimony to support a finding that some of the items seized were drug-related and were in plain view through Petitioner's open bedroom door.  Love, 138 S.W.3d at 681.  According to the testimony, this included items seen on the bed, at the foot of the bed, on an end table, and on a dresser.  Deputy Delay did not name any specific items but described the items on the bed as appearing to be "drug paraphernalia and items used for drug production."  (Tr. 105.)  Officer Crossland listed the following items and said that "some of them" were visible from the door and were on the bed or on an end table: tubing, duct tape, a bowl of unknown liquid, paper filters, jars, some diaper bags or bags (that were later found to contain a plastic bag containing a white powdery substance), a brown liquid substance, rubbing alcohol, and homemade funnels.  (Tr. 108, 110-11.)  Deputy Brown said that, through the door, he saw "needles" and "some different stuff" on the bed and at the foot of the bed, and a glass jar with a clear liquid substance on the dresser.  (Tr. 112.)  Detective Reid testified that he believed the different chemicals and other items discovered were being used to process or manufacture methamphetamine.  (Tr. 100.)

Petitioner submits a "supplementary report" (prepared by Detective Reid with the Booneville Police Department), an Arkansas State Crime Laboratory evidence submission form and laboratory analysis report, photographs of the items seized, and a handwritten list of the items seized (docket entry #5, at 1-3, 5-6, 10-22), none of which mentions any needles or syringes.  While correct, this discrepancy does not negate the fact that other

items testified to by the officers do appear in the documentation.[6]  Petitioner also argues

that the other items were not "recognizable contraband."  However, this is an attack on the

credibility of the witnesses who testified at the suppression hearing.  In response to the

officers' testimony, Petitioner testified that she had no idea where any of the items came

from, and her co-defendant also denied seeing any drug-related items.  (Tr. 118-119, 125-

27.)   It was not unreasonable for the state courts to believe the officers' testimony over

that of Petitioner and her co-defendant that these items were visible from the doorway of

Petitioner's bedroom, and to further accept the officers' testimony that they believed these

items, in their experience and under the totality of the circumstances, were related to the

manufacture or processing of methamphetamine.

Petitioner suggested to the trial court at the suppression hearing, (Tr. 131, 143), and

to the Arkansas Supreme Court in her direct appeal, (Resp't Ex. B, at 29-30, 32), as she

does here, that another officer may have opened the door and entered the bedroom prior

to the approach of Brown, Delay and Crossland.  The Arkansas Supreme Court declined

to speculate on this issue, holding that it was incumbent upon Petitioner to develop that

issue at the suppression hearing, which she did not do.  Love, 138 S.W.2d at 682.

Similarly, Petitioner has not presented any evidence here, much less anything clear and

convincing, to support her contention that another officer entered her bedroom first and

that he did so illegally.  Although it is unclear from the hearing testimony which officer first

---

[6]For example, the following items identified in the documentation are consistent with the officers' testimony: (1) E-1, "[p]lastic tubing with plastic lid attached by duct tape, roll of duct tape, and scissors" found on the bed; (2) E-2, container with coffee filters and a handmade plastic funnel, found on the dresser; (3) E-10, a glass jar and two plastic handmade funnels containing coffee filters, located on the night stand; (4) E-11, a glass jar and a plastic handmade funnel containing a coffee filter, on the night stand; (5) E-12, a glass bowl containing an unknown clear liquid, on the night stand, with the liquid later being identified by the state crime lab as "[m]ethamphetamine, amphetamine" (docket entry #5, at 1-2, 5-6, 19-21).

observed the items through the open door, this does not necessarily mean that any officer entered the bedroom illegally.  One reasonable inference from the record is that the first officer who approached the open door (whoever it was) observed the drug-related items and alerted the other officers.  Under these circumstances, it was not unreasonable for the state courts to accept the officers' testimony that when they approached Petitioner's bedroom door, it was open and they observed drug-related items in plain view.

Nor is she entitled to an evidentiary hearing in this Court to develop this or any other factual issues.  Where a habeas petitioner has failed to develop the factual basis of his claims in state court proceedings, the federal court "*shall not*" hold an evidentiary hearing unless the petitioner shows (1) that his claims rely on "a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court," or "a factual predicate that could not have been previously discovered through the exercise of due diligence," 28 U.S.C. § 2254(e)(2)(A), *and* (2) that "the facts underlying the claim[s] would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," id. § 2254(e)(2)(B).

The only new Supreme Court case of any relevance would be Randolph, and it involved the consent issue, rather than plain-view.  There are no undeveloped factual questions regarding the consent issue.  Furthermore, in deciding Randolph, the Supreme Court did not make it retroactive to cases on collateral review, there is no language suggesting it should be retroactive to cases on collateral review, nor has there been any indication by the Supreme Court since Randolph (or by any other court, for that matter) that the decision should be applied retroactively to state convictions already final at the time of

the decision.  See Tyler v. Cain, 533 U.S. 656, 663 (2001) (holding that "a new rule is not 'made retroactive to cases on collateral review' unless the Supreme Court holds it to be retroactive").

Second, Petitioner has not established the existence of any new facts that she could not have discovered earlier through the exercise of due diligence.  She was provided the opportunity to develop all factual issues in the state court, where she was represented by counsel during all relevant times.  The arguments she made there demonstrate an awareness of the gaps in the testimony and the possible presence of another officer, and she has not established that she was unable to further develop the factual issues despite diligent efforts.  Under these circumstances, a federal court is "not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."  Moore-El v. Luebbers, 446 F.3d 890, 901 (8th Cir. 2006) (quoting Williams, 529 U.S. at 437).

Third, even if Petitioner could meet either requirement of § 2254(e)(2)(A), she has failed to come forward with sufficient facts to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found her guilty, as required by subsection (B).  Other than her speculation and Deputy Brown's testimony that he thought another officer named Brian Berry was present, (Tr. 113), there is no proof that this officer was involved in the search of Petitioner's residence, much less that he illegally entered her bedroom before the other officers observed the items in question.  Additionally, the inquiry under this provision is not whether the state courts would have ruled differently on her motion to suppress, but whether she would have been convicted at trial of the

charged offenses.  Petitioner's trial transcript was not submitted here, and the record does

not show what evidence was presented at trial in support of guilt.

       D.    <u>Summary</u>.

       Petitioner has failed to demonstrate, under the deferential standard of § 2254(d),

that the Arkansas Supreme Court's decision upholding the denial of her suppression

motion was contrary to governing United States Supreme Court law, unreasonably applied

that law, or was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings.


V.

       Petitioner also argues in her petition, as an independent claim, that she was denied

due process due to the Arkansas Supreme Court's resolution of her Fourth Amendment

claim on a different basis than the trial court's.  This argument's implications in the context

of Petitioner's Fourth Amendment claims have been discussed above.  To the extent that

this states a cognizable federal habeas claim on its own, it is procedurally defaulted

because she never presented it to the state courts.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S.

722, 750 (1991) (habeas review of procedurally defaulted claims is barred unless petitioner

shows "cause" for default and "actual prejudice" from the alleged violation of federal law,

or demonstrates that failure to consider the claims will result in a "fundamental miscarriage

of justice" due to his actual innocence).  Petitioner expressly stated in a subsequent

pleading (docket entry #12, at 6) that she wished to dismiss any defaulted claims and

proceed only on the remaining, non-defaulted issues.

Her third claim states that she is "actually innocent" because the state failed to disclose to her, in violation of <u>Brady</u>, that no needles or other contraband were found in plain view.  To the extent that this raises a true <u>Brady</u> claim rather than another angle for attacking the evidence supporting the state courts' rulings on her Fourth Amendment claims, it is procedurally defaulted due to her failure to specifically raise such a claim in state court and will not be further discussed.

Furthermore, in a noncapital case such as this, a free-standing claim of actual innocence is "not itself a constitutional claim, but [is] instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits."  <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993).  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 313-17 (1995); <u>Burton v. Dormire</u>, 295 F.3d 839, 848 (8th Cir. 2002); <u>Mansfield v. Dormire</u>, 202 F.3d 1018, 1023-24 (8th Cir. 2000); <u>Meadows v. Delo</u>, 99 F.3d 280, 283 (8th Cir. 1996).  By dismissing her defaulted claims, her actual-innocence claim is no longer relevant.  Even assuming that such a free-standing claim could be raised, the standard "would necessarily be extraordinarily high," requiring a showing of new facts which "unquestionably establish" her innocence.  <u>Herrera</u>, 506 U.S. at 417; <u>Schlup</u>, 513 U.S. at 862.  Petitioner comes nowhere near this standard.  Her legal argument that she was convicted through the use of illegally obtained evidence is not a claim that she is factually innocent of committing the crimes for which she was convicted.

VI.

<u>Conclusion</u>

Petitioner's claims cannot entitle her to federal habeas relief.  Therefore, this 28 U.S.C. § 2254 petition for writ of habeas corpus should be dismissed in its entirety, with prejudice.

DATED this 3rd day of August, 2006.



_____
UNITED STATES MAGISTRATE JUDGE